BEARD, SECRETARY, PENNSYLVANIA DEPART-
MENT OF CORRECTIONS, ET AL. *v.* BANKS

No. 02-1603.   Argued February 24, 2004—Decided June 24, 2004

*Ronald Eisenberg* argued the cause for petitioners. With him on the briefs were *Scott C. Gartley, Thomas W. Dolgenos,* and *Lynne Abraham.*

*Albert J. Flora, Jr.*, argued the cause for respondent. With him on the brief were *Basil G. Russin, Joseph Cosgrove, Matthew C. Lawry,* and *Maureen Kearney Rowley.**

JUSTICE THOMAS delivered the opinion of the Court.

In *Mills* v. *Maryland,* 486 U. S. 367 (1988), and *McKoy* v. *North Carolina,* 494 U. S. 433 (1990), this Court held invalid capital sentencing schemes that require juries to disregard mitigating factors not found unanimously. In this case, we must determine whether the rule announced in *Mills* and *McKoy* can be applied on federal habeas corpus review to a defendant whose conviction became final in 1987. Under our retroactivity analysis as set forth in *Teague* v. *Lane,* 489 U. S. 288 (1989), federal habeas corpus petitioners may not avail themselves of new rules of criminal procedure outside two narrow exceptions. We conclude that *Mills* announced a new rule that does not fall within either of *Teague's* exceptions.

I

More than 20 years ago, a jury convicted respondent, George Banks, of 12 counts of first-degree murder, and the trial court sentenced him to death. The facts of this case are set forth in detail in the Pennsylvania Supreme Court's decision affirming respondent's conviction and sentence on direct review. See *Commonwealth* v. *Banks,* 513 Pa. 318, 521 A. 2d 1 (1987). Direct review ended when this Court denied certiorari on October 5, 1987. *Banks* v. *Pennsylvania,* 484 U. S. 873. Approximately eight months later, this Court handed down its decision in *Mills, supra,* which announced that the Constitution forbids States from imposing

---

*Kent S. Scheidegger* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Larry Yackle, Joshua Dratel, Steven R. Shapiro,* and *Stefan Presser;* and for the Pennsylvania Association of Criminal Defense Lawyers by *Louis M. Natali, Jr.,* and *Peter Goldberger.*

a requirement that the jury find a potential mitigating factor unanimously before that factor may be considered in the sentencing decision.

Respondent pursued state postconviction relief on the theory that the instructions and verdict form given to the jury in his case violated the *Mills* principle, but the Pennsylvania Supreme Court rejected this claim on the merits. See *Commonwealth* v. *Banks*, 540 Pa. 143, 656 A. 2d 467 (1995). Respondent then turned to the federal courts. Although the District Court denied relief, *Banks* v. *Horn*, 63 F. Supp. 2d 525 (MD Pa. 1999), the Court of Appeals for the Third Circuit reversed respondent's death sentence, *Banks* v. *Horn*, 271 F. 3d 527 (2001). In reaching its decision, the Court of Appeals declined to apply the retroactivity analysis set forth in *Teague* v. *Lane, supra,* to the question whether *Mills* applied retroactively to respondent. This was not necessary, in the Court of Appeals' view, because the Pennsylvania Supreme Court had itself applied *Mills.* 271 F. 3d, at 543. We summarily reversed, holding that "in addition to performing any analysis required by AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996], a federal court considering a habeas petition must conduct a threshold *Teague* analysis when the issue is properly raised by the state." *Horn* v. *Banks*, 536 U. S. 266, 272 (2002) *(per curiam) (Banks I).*

On remand, the Court of Appeals considered the retroactive application of *Mills. Banks* v. *Horn*, 316 F. 3d 228 (CA3 2003). The court recognized that its primary task was to determine whether *Mills* announced a new rule, and that this, in turn, required it to ascertain whether the precedent existing at the time respondent's conviction became final dictated or compelled the rule in *Mills.* 316 F. 3d, at 233–235. From this Court's decisions in *Lockett* v. *Ohio*, 438 U. S. 586 (1978), *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), and their direct progeny, the Court of Appeals distilled the rule that the "Eighth Amendment prohibits any barrier to the sentencer's consideration of mitigating evidence." 316 F. 3d, at

239. The Court of Appeals characterized this Court's decision in *Mills* as "merely recogniz[ing] that the perceived need for unanimity could constitute one such unconstitutional barrier," and concluded that the existing legal landscape compelled the decision in *Mills*. 316 F. 3d, at 240. Accordingly, the court held that *Mills* applied retroactively to respondent and reinstated the remainder of its previous opinion, again granting respondent relief from his death sentence.[1]

We granted the Commonwealth's second petition for certiorari in this case to decide whether *Mills* applies retroactively to respondent and, if so, whether the Pennsylvania Supreme Court unreasonably applied federal law in holding that there was no *Mills* error in respondent's case. 539 U. S. 987 (2003). Although the *Lockett/Eddings* line of cases supports the Court's decision in *Mills*, it does not compel that decision. *Mills* therefore announced a new rule. We are also unable to conclude that the *Mills* rule falls under either *Teague* exception. In particular, *Mills* did not announce a "watershed rul[e] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle* v. *Parks*, 494 U. S. 484, 495 (1990) (internal quotation marks omitted). Accordingly, we again reverse the judgment of the Court of Appeals.[2]

---

[1] Judge Sloviter wrote separately to express her view that *Mills* v. *Maryland*, 486 U. S. 367 (1988), established a new rule that qualified for neither *Teague* v. *Lane*, 489 U. S. 288 (1989), exception. 316 F. 3d 228, 253–254 (CA3 2003) (opinion concurring in judgment). Judge Sloviter nevertheless posited that *Mills* could be applied to respondent because of Pennsylvania's "unique relaxed waiver doctrine in capital cases." 316 F. 3d, at 256.

[2] Given our determination that the Court of Appeals erred in holding that *Mills* applied retroactively to respondent, we do not reach the question whether the Court of Appeals also erred in concluding that the Pennsylvania Supreme Court unreasonably applied *Mills*.

## II

Under *Teague*, the determination whether a constitutional rule of criminal procedure applies to a case on collateral review involves a three-step process. See, *e. g., Lambrix* v. *Singletary*, 520 U. S. 518, 527 (1997). First, the court must determine when the defendant's conviction became final. Second, it must ascertain the "legal landscape as it then existed," *Graham* v. *Collins*, 506 U. S. 461, 468 (1993), and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule, *Saffle, supra*, at 488. That is, the court must decide whether the rule is actually "new." Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity. *Lambrix, supra*, at 527.[3]

### A

Ordinarily, ascertaining the date on which a defendant's conviction becomes final poses no difficulties: State convictions are final "for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Caspari* v. *Bohlen*, 510 U. S. 383, 390 (1994). See also *Clay* v. *United States*, 537 U. S. 522, 527 (2003). Respondent, however, urges a different rule. He argues that, in view of the Pennsylvania Supreme Court's unique "relaxed waiver rule"—pursuant to which that court considered his *Mills* claim on the merits—his conviction became final for *Teague* purposes in 1995 when the State Supreme Court decided the *Mills* claim against him. Brief for Respondent 25–31. Because of the Pennsylvania Supreme Court's practice

---

[3] Rules that fall within what we have referred to as *Teague*'s first exception "are more accurately characterized as substantive rules not subject to [*Teague*'s] bar." *Schriro* v. *Summerlin, ante*, at 352, n. 4. See also *infra*, at 416, and n. 7.

of considering forfeited claims in capital cases, respondent insists, "conventional notions of 'finality'" do not apply. *Id.*, at 27.

In the past, the Pennsylvania Supreme Court did, in fact, apply a "relaxed waiver rule" in death penalty cases. See, *e. g., Commonwealth* v. *DeHart,* 539 Pa. 5, 25, 650 A. 2d 38, 48 (1994); *Commonwealth* v. *Billa,* 521 Pa. 168, 181, 555 A. 2d 835, 842 (1989). But this practice, which the court has abandoned, see *Commonwealth* v. *Albrecht,* 554 Pa. 31, 44–46, 720 A. 2d 693, 700 (1998), "was not absolute, but discretionary," *Commonwealth* v. *Freeman,* 573 Pa. 532, 557, n. 9, 827 A. 2d 385, 400, n. 9 (2003) (describing past practice). Notably, the Pennsylvania Supreme Court has expressly stated, in a capital case, that it would decline to apply *Mills* retroactively. *Commonwealth* v. *Peterkin,* 538 Pa. 455, 465, n. 4, 649 A. 2d 121, 126, n. 4 (1994).

A state court's past discretionary "'practice' [of] declin-[ing] to apply ordinary waiver principles in capital cases," *Albrecht, supra,* at 44, 720 A. 2d, at 700, does not render convictions and sentences that are no longer subject to direct review nonfinal for *Teague* purposes. Such a judgment is "final" despite the possibility that a state court might, in its discretion, decline to enforce an available procedural bar and choose to apply a new rule of law. Cf. *Wainwright* v. *Sykes,* 433 U. S. 72, 81–91 (1977).

Respondent's argument reflects a fundamental misunderstanding of *Teague. Teague*'s nonretroactivity principle acts as a limitation on the power of federal courts to grant "habeas corpus relief to . . . state prisoner[s]." *Caspari,* 510 U. S., at 389. That is why federal habeas corpus courts "*must* apply *Teague* before considering the merits of [a] claim," *ibid.,* whenever *the State* raises the question, a point we explained in *Banks I,* see 536 U. S., at 271. See also *id.,* at 271–272 (explaining that the Court of Appeals had erred by focusing only on the Pennsylvania Supreme Court's treatment of respondent's *Mills* claim).

This should make clear that the *Teague* principle protects not only the reasonable judgments of state courts but also the States' interest in finality quite apart from their courts. As *Teague* explained:

> "In many ways the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions, cf. *Younger* v. *Harris*, 401 U. S. 37, 43–54 (1971), for it *continually* forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." 489 U. S., at 310.

In short, our rule for determining when a state conviction becomes final applies to this case without modification, and we agree with the Court of Appeals that respondent's conviction became final in 1987. See 316 F. 3d, at 235.

## B

We must therefore assay the legal landscape as of 1987 and ask "whether the rule later announced in *[Mills]* was *dictated* by then-existing precedent—whether, that is, the unlawfulness of [respondent's] conviction was apparent to all reasonable jurists." *Lambrix, supra*, at 527–528. In *Mills*, the Court held that the Constitution prohibits States from requiring jurors to find mitigating factors unanimously. *McKoy*, 494 U. S., at 444; *Mills*, 486 U. S., at 374–375; *id.*, at 384 (vacating death sentence because the jury instructions gave rise to a "substantial probability that reasonable jurors . . . may have thought they were precluded from considering any mitigating evidence" not found unanimously).[4]

In reaching its conclusion, the Court in *Mills* and *McKoy* relied on a line of cases beginning with *Lockett* v. *Ohio*, 438

---

[4] Although nothing in this case turns on it, we note that it is arguable that the "*Mills* rule" did not fully emerge until the Court issued *McKoy* v. *North Carolina*, 494 U. S. 433 (1990). See *id.*, at 459–463 (SCALIA, J., dissenting).

U. S. 586 (1978) (plurality opinion), and *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982). In *Lockett*, a plurality of the Court struck down Ohio's death penalty statute because it prevented the sentencer from "considering, *as a mitigating factor*," certain "aspect[s] of a defendant's character or record and [certain] circumstances of the offense that the defendant proffer[ed] as a basis for a sentence less than death." 438 U. S., at 604. A majority of the Court first embraced this principle in *Eddings*. There, the Court confronted a situation in which the sentencer had found, "*as a matter of law* [that it] was unable even to consider [potentially mitigating] evidence." 455 U. S., at 113. The Court held that this limitation violated the *Lockett* rule. 455 U. S., at 113–115. See also *Skipper* v. *South Carolina*, 476 U. S. 1, 4, 8–9 (1986) (holding that States cannot, through evidentiary rules, exclude relevant mitigating evidence from the sentencer's consideration).

In *Mills*, the Court noted that its previous cases did not depend on the source of the potential barrier to the sentencer's ability to consider mitigating evidence. 486 U. S., at 375. The Court then asserted that "[t]he same [rule must apply] with respect to a single juror's holdout vote against finding the presence of a mitigating circumstance." *Ibid.* See also *McKoy, supra,* at 441–443 (quoting *Mills* and performing the same analysis).

The generalized *Lockett* rule (that the sentencer must be allowed to consider any mitigating evidence) could be thought to support the Court's conclusion in *Mills* and *McKoy*. But what is essential here is that it does not mandate the *Mills* rule. Each of the cases relied on by *Mills* (and *McKoy*) specifically considered only obstructions to the *sentencer's* ability to consider mitigating evidence. *Mills'* innovation rests with its shift in focus to individual jurors. We think it clear that reasonable jurists could have differed as to whether the *Lockett* principle compelled *Mills*. See *Lambrix*, 520 U. S., at 527–528.

But there is no need to guess.   In *Mills,* four Justices dissented, reasoning that because nothing prevented the jurors from hearing any mitigating evidence that the defendant proffered, the *Lockett* principle did not control.   486 U. S., at 394 (opinion of REHNQUIST, C. J.).   In *McKoy,* three Justices dissented, explaining that "'the principle established in *Lockett*' does not remotely support" the new focus on individual jurors.   494 U. S., at 464 (opinion of SCALIA, J.); see *id.,* at 466 ("In short, *Lockett* and *Eddings* are quite simply irrelevant to the question before us . . ."); see also *id.,* at 452–453 (KENNEDY, J., concurring in judgment) (noting that the Court "stretche[d]" the *Lockett* cases "beyond their proper bounds").   The dissent in *McKoy* stressed the Court's move from jury to juror.   See 494 U. S., at 465–466 (opinion of SCALIA, J.).   Indeed, prior to *Mills, none* of the Court's relevant cases addressed individual jurors, see, *e. g., Hitchcock* v. *Dugger,* 481 U. S. 393 (1987), a trend that continued even after *Mills,* see, *e. g., Saffle* v. *Parks,* 494 U. S. 484 (1990); *Penry* v. *Lynaugh,* 492 U. S. 302 (1989); *Franklin* v. *Lynaugh,* 487 U. S. 164 (1988).

The *McKoy* dissent also explained that the *Mills* rule governs how the sentencer considers evidence, not what evidence it considers.   In the dissent's view, the *Lockett* line governed the latter but not the former.   See 494 U. S., at 465–466 (opinion of SCALIA, J.).   For this distinction, the dissent relied on *Saffle* v. *Parks, supra,* decided the same day. There, the Court held that the *Lockett* line of cases did not compel (assuming it informed) the sought-for rule that States may not "instruct the sentencer to render its decision on the evidence without sympathy."   494 U. S., at 490.   The Court observed:

> "Parks asks us to create a rule relating, not to *what* mitigating evidence the jury must be permitted to consider in making its sentencing decision, but to *how* it must consider the mitigating evidence.   There is a simple and logical difference between rules that govern

what factors the jury must be permitted to consider in making its sentencing decision and rules that govern how the State may guide the jury in considering and weighing those factors in reaching a decision." *Ibid.*

*Thus, although the Lockett* principle—conceived of at a high level of generality—could be thought to support the *Mills* rule, reasonable jurists differed even as to this point. It follows *a fortiori* that reasonable jurists could have concluded that the *Lockett* line of cases did not compel *Mills*.[5] Given the brand new attention *Mills* paid to individual jurors and the relevance of the what/how distinction drawn in *Saffle* (which again distinguishes *Mills* from the *Lockett* line), we must conclude that the *Mills* rule "br[o]k[e] new ground," *Teague*, 489 U. S., at 301.[6] Accordingly, *Mills* announced a new rule, which does not apply to respondent on collateral review, unless, of course, it falls under one of *Teague*'s exceptions.

### C

*Teague*'s bar on retroactive application of new rules of constitutional criminal procedure has two exceptions. First, the bar does not apply to rules forbidding punishment "of certain primary conduct [or to] rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Penry, supra*, at 330; see also

---

[5] Because the focus of the inquiry is whether *reasonable* jurists could differ as to whether precedent compels the sought-for rule, we do not suggest that the mere existence of a dissent suffices to show that the rule is new.

[6] The Court of Appeals erred by drawing from *Lockett* v. *Ohio*, 438 U. S. 586 (1978), and *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), the general rule that "the Constitution prohibited any barrier to the *jury's* consideration of mitigating evidence," 316 F. 3d, at 241–243 (emphasis added), without also acknowledging that the rule, for purposes of the *Teague* analysis, did not automatically extend to arguably analogous contexts. It is with respect to this last point that reasonable jurists did in fact differ.

*O'Dell* v. *Netherland,* 521 U. S. 151, 157 (1997).[7]  There is no argument that this exception applies here.  The second exception is for " 'watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.' "  *Ibid.* (quoting *Graham,* 506 U. S., at 478).

We have repeatedly emphasized the limited scope of the second *Teague* exception, explaining that " 'it is clearly meant to apply only to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty.' "  *O'Dell, supra,* at 157 (quoting *Graham, supra,* at 478).  And, because any qualifying rule " 'would be so central to an accurate determination of innocence or guilt [that it is] unlikely that many such components of basic due process have yet to emerge,' " *Graham, supra,* at 478 (quoting *Teague, supra,* at 313), it should come as no surprise that we have yet to find a new rule that falls under the second *Teague* exception.  Perhaps for this reason, respondent does not even attempt to argue that *Mills* qualifies or to rebut petitioners' argument that it does not, Brief for Petitioners 23–26.

In providing guidance as to what might fall within this exception, we have repeatedly referred to the rule of *Gideon* v. *Wainwright,* 372 U. S. 335 (1963) (right to counsel), and only to this rule.  See, *e. g., Saffle, supra,* at 495; cf. *Gilmore* v. *Taylor,* 508 U. S. 333, 364 (1993) (Blackmun, J., dissenting).  *Gideon* overruled *Betts* v. *Brady,* 316 U. S. 455 (1942), noting that *Betts* itself had "made an abrupt break with [the Court's] well-considered precedents."  372 U. S., at 344.  The Court continued:

> "Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society.  Similarly, there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can

---

[7] As noted above, these rules are more properly viewed as substantive and therefore not subject to *Teague*'s bar.  See n. 3, *supra.*

get to prepare and present their defenses. That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers in criminal courts are necessities, not luxuries. *The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him." Ibid.* (emphasis added).

See also *id.,* at 344–345 (quoting *Powell* v. *Alabama,* 287 U. S. 45, 68–69 (1932)). *Gideon,* it is fair to say, "alter[ed] our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer* v. *Smith,* 497 U. S. 227, 242 (1990) (internal quotation marks omitted).

By contrast, we have not hesitated to hold that less sweeping and fundamental rules do not fall within *Teague's* second exception. In *O'Dell* v. *Netherland, supra,* for example, we considered the retroactivity of the rule announced in *Simmons* v. *South Carolina,* 512 U. S. 154 (1994). *Simmons* held that a capital defendant must be allowed to inform the sentencer that he would be ineligible for parole if the prosecution argues future dangerousness. We rejected the petitioner's argument that the *Simmons* rule was "'on par' with *Gideon* v. *Wainwright,* 372 U. S. 335 (1963)," emphasizing "the sweeping [nature] of *Gideon,* which established an affirmative right to counsel in all felony cases." *O'Dell, supra,* at 167.

And, in *Sawyer* v. *Smith, supra,* we considered whether a habeas petitioner could make use of the rule announced in *Caldwell* v. *Mississippi,* 472 U. S. 320, 323 (1985) (holding

that the Eighth Amendment bars imposition of the death penalty by a jury that had been led to believe that responsibility for the ultimate decision rested elsewhere).  There too we declined to give retroactive effect to a rule that effectively withheld relevant information from the sentencer. See *Sawyer, supra,* at 242–245.  We acknowledged that the *Caldwell* rule was intended to enhance "the accuracy of capital sentencing."  497 U. S., at 244.  But because it effected an incremental change, we could not conclude that "this systemic rule enhancing reliability is an 'absolute prerequisite to fundamental fairness.'"  *Ibid.* (quoting *Teague,* 489 U. S., at 314).  See also *Graham, supra,* at 478 (concluding that the rule announced in *Penry* v. *Lynaugh,* 492 U. S. 302 (1989), does not fall within the second *Teague* exception).

We recognize that avoidance of potentially arbitrary impositions of the death sentence motivated the Court in *Mills* and *McKoy.*  *Mills* described two troubling situations that could theoretically occur absent the *Mills* rule.  Eleven of twelve jurors, could, for example, agree that six mitigating circumstances existed, but one holdout juror could nevertheless force the death sentence.  Similarly, all 12 jurors could agree that some mitigating circumstances existed and that these outweighed any aggravators, but because they did not agree on which mitigating circumstances were present, they would again have to return a death sentence.  See *Mills,* 486 U. S., at 373–374; see also *McKoy,* 494 U. S., at 439–440 (describing these examples).  Imposition of the death penalty in these circumstances, the Court reasoned, "would be the 'height of arbitrariness.'"  *Id.,* at 440 (quoting *Mills, supra,* at 374).  See also *McKoy, supra,* at 454 (KENNEDY, J., concurring in judgment).

Quite obviously, the Court decided *Mills* and *McKoy* as it did to avoid this possibility.  But because "[a]ll of our Eighth Amendment jurisprudence concerning capital sentencing is directed toward the enhancement of reliability and accuracy in some sense," the fact that a new rule removes some re-

mote possibility of arbitrary infliction of the death sentence
does not suffice to bring it within *Teague's* second exception.
*Sawyer, supra,* at 243.

However laudable the *Mills* rule might be, "it has none of
the primacy and centrality of the rule adopted in *Gideon.*"
*Saffle,* 494 U. S., at 495. The *Mills* rule applies fairly nar-
rowly and works no fundamental shift in "our understanding
of the *bedrock procedural elements*" essential to fundamen-
tal fairness. *O'Dell,* 521 U. S., at 167 (internal quotation
marks omitted). We therefore conclude that the *Mills* rule
does not fall within the second *Teague* exception.

## III

We hold that *Mills* announced a new rule of constitutional
criminal procedure that falls within neither *Teague* excep-
tion. Accordingly, that rule cannot be applied retroactively
to respondent. The judgment of the Court of Appeals is
reversed, and the case is remanded for further proceedings
consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE
GINSBURG, and JUSTICE BREYER join, dissenting.

A capital sentencing procedure that required the jury to
return a death sentence if even a single juror supported that
outcome would be the " ' "height of arbitrariness." ' " *Ante,*
at 419. The use of such a procedure is unquestionably un-
constitutional today, and I believe it was equally so in 1987
when respondent's death sentence became final. The Court
reaches a different conclusion because it reads *Mills* v.
*Maryland,* 486 U. S. 367 (1988), to announce a "new rule" of
criminal procedure that may not be applied on federal habeas
review to defendants whose convictions became final before
*Mills* was decided. *Ante,* at 408. In my opinion, however,
*Mills* simply represented a straightforward application of
our longstanding view that "the Eighth and Fourteenth

Amendments cannot tolerate the infliction of a sentence of death under [a] legal syste[m] that permit[s] this unique penalty to be . . . wantonly and . . . freakishly imposed." *Furman* v. *Georgia,* 408 U. S. 238, 310 (1972) (Stewart, J., concurring).

The dispute in *Mills* concerned jury instructions and a verdict form that the majority read to create a "substantial probability that reasonable jurors . . . well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." 486 U. S., at 384. The resulting unanimity requirement, the majority concluded, violated the Constitution in that it "allow[ed] a 'holdout' juror to prevent the other jurors from considering mitigating evidence." *McKoy* v. *North Carolina,* 494 U. S. 433, 438 (1990) (quoting *Mills,* 486 U. S., at 375). When *Mills* was decided, there was nothing novel about acknowledging that permitting one death-prone juror to control the entire jury's sentencing decision would be arbitrary. That acknowledgment was a natural outgrowth of our cases condemning mandatory imposition of the death penalty, *Roberts* v. *Louisiana,* 431 U. S. 633 (1977) *(per curiam); Woodson* v. *North Carolina,* 428 U. S. 280 (1976) (plurality opinion), recognizing that arbitrary imposition of that penalty violates the Eighth Amendment,[1] *e. g., Zant* v. *Stephens,* 462 U. S. 862, 874 (1983); *Gregg* v. *Georgia,* 428 U. S. 153, 189 (1976); *Furman, supra,* and mandating procedures that guarantee full consideration of miti-

---

[1] JUSTICE KENNEDY made precisely this point in his concurrence in *McKoy* v. *North Carolina,* 494 U. S. 433, 454 (1990):

"Application of the death penalty on the basis of a single juror's vote is 'intuitively disturbing.' . . . More important, it represents imposition of capital punishment through a system that can be described as arbitrary or capricious. The Court in *Mills* described such a result as the 'height of arbitrariness.' . . . Given this description, it is apparent that the result in *Mills* fits within our line of cases forbidding the imposition of capital punishment on the basis of 'caprice,' in 'an arbitrary and unpredictable fashion,' or through 'arbitrary' or 'freakish' means."

gating evidence, *e. g., Eddings* v. *Oklahoma,* 455 U. S. 104 (1982); *Lockett* v. *Ohio,* 438 U. S. 586 (1978) (plurality opinion). Indeed, in my judgment, the kind of arbitrariness that would enable 1 vote in favor of death to outweigh 11 in favor of forbearance would violate the bedrock fairness principles that have governed our trial proceedings for centuries. Rejecting such a manifestly unfair procedural innovation does not announce a "new rule" covered by *Teague* v. *Lane,* 489 U. S. 288, 301–302 (1989), but simply affirms that our fairness principles do not permit blatant exceptions.[2]

·This leaves only the question whether reasonable jurors could have read Pennsylvania's jury instructions and verdict

---

[2] Supporting this reading, even the dissenting Justices in *Mills* v. *Maryland,* 486 U. S. 367 (1988), did not challenge the majority's assumption that instructions unambiguously requiring unanimity on the existence of any mitigating factor would be unconstitutional; they argued only that reasonable jurors would have understood that in order "to mark 'no' to each mitigating factor on the sentencing form, all 12 jurors [had to] agree." *Id.,* at 394 (REHNQUIST, C. J., dissenting) (emphasis added). I recognize that some Justices believe the *Mills* Court had no occasion to consider the constitutionality of a unanimity requirement because the State had conceded the point. See *McKoy,* 494 U. S., at 459 (SCALIA, J., dissenting) ("Although there is language in *Mills* . . . suggesting that a unanimity requirement would contravene this Court's decisions . . . , that issue plainly was not presented in *Mills,* and can therefore not have been decided"). *Mills'* author, Justice Blackmun, disagreed with this view, however: "[T]he Maryland instructions [at issue in *Mills*] were held to be invalid because they were susceptible of two plausible interpretations, *and under one of those interpretations the instructions were unconstitutional.*" *McKoy,* 494 U. S., at 445 (concurring opinion) (emphasis in original).

I think Justice Blackmun had the better of this argument, but even if one assumes the *Mills* dissenters failed to defend the constitutionality of unanimity requirements because they did not think the issue properly before the Court rather than because they, too, condemned such requirements, my overall point remains the same: executing a defendant when only 1 of his 12 jurors believes that to be the appropriate penalty. would be "so wanto[n] and so freakis[h]" as to violate the Eighth and Fourteenth Amendments, *Furman* v. *Georgia,* 408 U. S. 238, 310 (1972) (Stewart, J., concurring), and that violation would have been as clear in 1987 as today.

form to impose a unanimity requirement with respect to mitigating circumstances. For the reasons identified by the Third Circuit, *Banks* v. *Horn*, 271 F. 3d 527, 543–551 (2001); see also *Banks* v. *Horn*, 316 F. 3d 228, 247 (2003) (leaving in place the relevant portions of the court's earlier opinion), particularly with respect to the verdict form, 271 F. 3d, at 549–550, I answer this question in the affirmative.

I would affirm the judgment of the Court of Appeals.

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, dissenting.

I join JUSTICE STEVENS's dissenting opinion in this case. I add this word about the way I see its relation to JUSTICE BREYER's dissenting opinion in Schriro v. Summerlin, *ante*, p. 358, and to other cases in the line that began with *Teague* v. *Lane*, 489 U. S. 288 (1989).

In determining whether *Mills* v. *Maryland*, 486 U. S. 367 (1988), states a new rule of constitutional law for purpose of *Teague*'s general bar to applying such rules on collateral review, the Court invokes the perspective of "'all reasonable jurists,'" *ante*, at 413 (quoting *Lambrix* v. *Singletary*, 520 U. S. 518, 528 (1997)); see also *ante*, at 414–416. It acknowledges, however, that this standard is objective, so that the presence of actual disagreement among jurists and even among Members of this Court does not conclusively establish a rule's novelty. *Ante*, at 416, n. 5; cf. *Wright* v. *West*, 505 U. S. 277, 304 (1992) (O'CONNOR, J., concurring in judgment). This objectively reasonable jurist is a cousin to the common law's reasonable person, whose job is to impose a judicially determined standard of conduct on litigants who come before the court. Similarly, the function of *Teague*'s reasonable-jurist standard is to distinguish those developments in this Court's jurisprudence that state judges should have anticipated from those they could not have been expected to foresee.

In applying *Teague*, this Court engages in an ongoing process of defining the characteristics of a reasonable jurist,

by identifying arguments that reasonable jurists would or would not accept. The particular characteristic at stake here is the degree to which a reasonable jurist would avoid the risk of a certain kind of erroneous outcome in a capital case. *Mills's* rule protects against essentially the same kind of error that JUSTICE BREYER discusses in *Summerlin:* a death sentence that is arbitrary because it is inaccurate as a putative expression of "'the conscience of the community on the ultimate question of life or death,'" *ante,* at 360 (dissenting opinion) (quoting *Witherspoon* v. *Illinois,* 391 U. S. 510, 519 (1968)). JUSTICE BREYER has explained in his *Summerlin* opinion why some new rules demanding that kind of accuracy should be applied through a *Teague* exception, and our longstanding espousal of accurate expression of community conscience should also inform our judgment, in any debatable case, about the newness of a rule.

As JUSTICE STEVENS says, a death sentence based upon a verdict by 11 jurors who would have relied on a given mitigating circumstance to spare a defendant's life, and a single holdout who blocked them from doing so, would surely be an egregious failure to express the public conscience accurately. *Ante,* at 420–421 (dissenting opinion). The question presented by this case is ultimately whether the Court should deem reasonable, and thus immunize from collateral attack, at least at the first *Teague* stage, a reading of its pre-*Mills* precedents that accepts the risk of such errors that Maryland's or Pennsylvania's jury instructions and verdict form would have produced.

The Court concludes that, as compared with *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982), *Mills* "shift[ed] . . . focus" from "obstructions to the *sentencer's* ability to consider mitigating evidence" to the abilities of "individual jurors" to do so, and that a reasonable jurist could have drawn a distinction on this basis. *Ante,* at 414. This approach gives considerable weight to a reasonable jurist's analytical capacity to pick out arguably material differences between sets of

facts, and relatively less to the jurist's understanding of the substance of the principles underlying our Eighth Amendment cases that follow *Furman* v. *Georgia,* 408 U. S. 238 (1972) *(per curiam).* Although the Court's view of the reasonable jurist is not inconsistent with some. of *Teague's* progeny,* for the reasons given in JUSTICE BREYER's dissent in *Summerlin, ante,* at 362–365, 365–366, I am now convinced that this reading of *Teague* gives too much importance to the finality of capital sentences and not enough to their accuracy. I would affirm the judgment of the Court of Appeals, and respectfully dissent.

---

*See, *e. g., O'Dell* v. *Netherland,* 521 U. S. 151, 157–166 (1997) (holding new the rule of *Simmons* v. *South Carolina,* 512 U. S. 154 (1994), that a jury may not be misled about defendant's parole eligibility when prosecutor argues future dangerousness); *Lambrix* v. *Singletary,* 520 U. S. 518, 527–539 (1997) (holding new the rule of *Espinosa* v. *Florida,* 505 U. S. 1079 (1992) *(per curiam),* that a Florida jury's consideration of a vague aggravating factor taints a judge's later death sentence); see also *Stringer* v. *Black,* 503 U. S. 222, 243–247 (1992) (SOUTER, J., dissenting) (arguing that the rule of *Maynard* v. *Cartwright,* 486 U. S. 356 (1988), that sentencer's weighing among others of a vague aggravating factor taints a death sentence, was new).