Ana L. **MENDOZA**, Petitioner,

v.

**UNITED STATES of America,**
**Respondent.**

**Criminal No. 1:01cr214.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 24, 2011.

**793**

John T. Morton, U.S. Attorneys, Alexandria, VA, for Respondent.

Denise Jakabcin Tassi, Alexandria, VA, for Petitioner.

## MEMORANDUM OPINION

T.S. ELLIS, III, District Judge.

This petition for a writ of error *coram nobis* comes nearly ten years after petitioner's conviction became final. The occasion for the filing at this time is the Supreme Court's recent decision in *Padilla v. Kentucky*, —— U.S. ——, 130 S.Ct. 1473, 1486, 176 L.Ed.2d 284 (2010), holding that

the Sixth Amendment requires defense counsel to inform a client defendant whether his or her plea carries a risk of deportation. Specifically, petitioner contends that her conviction and already fully-served sentence must now be vacated because her court-appointed counsel rendered constitutionally ineffective assistance by failing to advise her of the possible immigration consequences of her guilty plea, in violation of *Padilla.* For the reasons that follow, petitioner's motion must be denied.

### I.

On June 14, 2001, petitioner Ana L. Mendoza, a Nicaraguan citizen with legal permanent resident status,[1] appeared for a scheduled plea hearing accompanied by her court-appointed counsel and a Spanish–English interpreter. In the course of the hearing, petitioner knowingly and voluntarily waived her right to an indictment and pled guilty to a criminal information charging her with one count of identification document fraud, in violation of 18 U.S.C. §§ 1028(a)(1), (b)(1)(B) and (c)(3)(A) and 2. Petitioner pled guilty on this occasion pursuant to a written Plea Agreement and Statement of Facts, both of which were signed by petitioner, her court-appointed counsel, and counsel for the government.

As described in the Statement of Facts, petitioner began working for Jenni Wrenn Inc. Realtors shortly after her arrival in this country. In the course of that employment, between June 2000 and February 2001, petitioner participated in an extensive scheme designed to assist illegal

---

**1.** Records from the Immigration and Naturalization Service reflect that petitioner entered the United States as a legal permanent resident on November 22, 1999. In this regard, petitioner contends (i) that her mother immigrated to the United States approximately 20 years earlier, (ii) that her mother eventually became a naturalized citizen, and (iii) that she (petitioner) waited for years in Nicaragua to be able to join her mother legally in the United States.

aliens living in states other than Virginia to obtain Virginia driver's licenses and identification documents by means of fraud. Petitioner personally participated in the fraud by assisting with the completion of numerous false Virginia Department of Motor Vehicle forms. Significantly, petitioner knew that the aliens for whom she prepared forms did not live in Virginia; she also knew that those aliens later used the false forms to obtain Virginia driver's licenses and identification documents to which they were not legally entitled.

A review of the plea transcript confirms that an extensive Rule 11 plea colloquy occurred prior to acceptance of petitioner's guilty plea. In the course of this colloquy, petitioner was explicitly advised of all of the possible penalties and consequences of a plea of guilty in this case, including the risk of deportation. *See* Tr. of 6/14/2001 Plea Hr'g at 22 (where petitioner was specifically advised that she "will also be subject to deportation" as a result of her guilty plea). The record further reflects that petitioner confirmed, under oath in the course of the plea hearing, that she understood all of the possible consequences of her guilty plea. *See id.* (where petitioner replied unequivocally "Yes, sir," when asked whether she "underst[ood] ... all of th[e] ... possible consequences of [her] plea in this case"). The specific Rule 11 exchange on this issue was as follows:

> THE COURT: Ms. Mendoza, it is important that you understand all of the consequences of your plea of guilty, and I am going to list those for you now. First, the maximum penalty for the offense is a maximum term of 15 years in prison.... You could also be required to pay a punitive fine of up to $250,000, [and] a special assessment. You would be required to serve three years of supervised release following any period of confinement. And if you were to violate

any of the terms of the supervised release, you could be returned to prison for the full three-year term. *And finally, you will also be subject to deportation.* Do you understand that all of those are possible consequences of your plea in this case?

> THE DEFENDANT: Yes, sir.

*Id.* at 21–22 (emphasis added).

Petitioner later appeared for sentencing on September 7, 2001, again with her court-appointed counsel and a Spanish–English interpreter. At the hearing, petitioner was granted a two-level reduction to her offense level for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, thereby placing her at a total offense level of 10 and a criminal history category of I. This offense level was then further reduced by half to 5 on the government's substantial assistance motion pursuant to U.S.S.G. § 5K1.1, resulting in a guidelines range of imprisonment of zero to six months. Petitioner was ultimately sentenced to a period of two years of supervised probation, with the special conditions that she serve six weekends in jail and perform fifty hours of community service. Petitioner neither appealed her conviction nor filed a collateral attack, and she successfully served her custody sentence and two-year period of supervised probation without incident or violation.

Now, nearly ten years after her conviction, but as a result of the conviction, petitioner finds herself facing removal from the United States pursuant to 8 U.S.C. § 1227(a)(2)(A)(i) (providing that an alien is deportable if he or she "is convicted of a crime involving moral turpitude committed within five years ... after the date of admission" and "is convicted of a crime for which a sentence of one year or longer may be imposed"). Given this, and in the wake of the Supreme Court's recent

decision in *Padilla v. Kentucky*, —— U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), petitioner, by newly retained counsel, filed the instant motion for a writ of error *coram nobis*, claiming that her court-appointed counsel rendered constitutionally ineffective assistance by failing to advise her of the possible immigration consequences of her guilty plea. In this regard, petitioner contends that she would not have pled guilty had she known she could or would be deported and that she instead would have proceeded to trial. As a result of this alleged ineffective assistance of counsel, petitioner contends that her conviction and sentence must be vacated. Both parties have fully briefed and argued the issues raised in petitioner's *coram nobis* motion and the matter is now ripe for resolution.

## II.

■ The Supreme Court recognized long ago that a writ of *coram nobis* is available to correct errors "of the most fundamental character" that have occurred in a criminal proceeding. *United States v. Morgan*, 346 U.S. 502, 512, 74 S.Ct. 247, 98 L.Ed. 248 (1954). Yet, it is clear that such "extraordinary" relief is only available "under circumstances compelling such action to achieve justice." *Id.* at 511, 74 S.Ct. 247. In other words, a writ of error *coram nobis* may only issue "to correct errors resulting in a complete miscarriage of justice." *Jimenez v. Trominski*, 91 F.3d 767, 768 (5th Cir.1996).

■ It is well-established that five requirements must be met to obtain *coram nobis* relief, namely (i) that petitioner's conviction or sentence involved an error of the most fundamental character; (ii) that it is probable that a different result would have occurred if not for the error; (iii) that adverse consequences continue to flow from the conviction such that a case or controversy exists within the meaning of Article III;[2] (iv) that a more usual remedy is not presently available to correct the error; and (v) that sound reasons exist for not challenging the error earlier, such as by direct appeal or collateral attack. *See Hanan v. United States*, 402 F.Supp.2d 679, 684 (E.D.Va.2005) (citing *Scates v. United States*, 914 F.2d 249 (4th Cir.1990) (unpublished opinion); *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir.1987)). In analyzing these requirements, a reviewing court must presume that the underlying proceedings were correct and the burden of showing otherwise rests on the petitioner. *See, e.g., Morgan*, 346 U.S. at 512, 74 S.Ct. 247; *U.S. v. Mandanici*, 205 F.3d 519, 524 (2d Cir.2000); *Foont v. U.S.*, 93 F.3d 76, 78–79 (2d Cir.1996). Notably, that burden is substantial, exceeding that of a habeas petitioner. *See, e.g., U.S. v. Stoneman*, 870 F.2d 102, 106 (3d Cir.1989) (stating that the burden placed on a petitioner seeking a writ of *coram nobis* exceeds the corresponding burden placed on a habeas petitioner); *Jimenez*, 91 F.3d at 768 n. 6 (same). Accordingly, successful *coram nobis* petitions are exceedingly rare and "generally involve[ ] such fundamental defects as deprivation of counsel ... or coerced guilty pleas." *U.S. v. Keogh*, 391 F.2d 138, 148 (2d Cir.1968) (citation omitted); *see also Morgan*, 346 U.S. at 512, 74 S.Ct. 247 (stating that "[w]here it cannot be deduced from the record whether counsel was properly waived, ... no other remedy being then available and sound reasons existing for failure to seek appropriate earlier relief, this motion in the

---

**2.** In this regard, it is also well-settled that a writ *of coram nobis* may lie where, as here, the convicted person has already completed her sentence and is no longer in custody. *See Morgan*, 346 U.S. at 510, 74 S.Ct. 247; *United States v. Hay*, 702 F.2d 572 (5th Cir.1983).

nature of the extraordinary writ of coram nobis must be heard").

Here, the government correctly concedes that petitioner has satisfied three of the five *coram nobis* requirements, given that it is clear (i) that adverse consequences continue to flow from the instant conviction in the form of petitioner's impending deportation, (ii) that a more usual remedy is not now available to correct the error as petitioner has already completed service of her sentence, and (iii) that sound reasons exist for not challenging the error earlier. Where the parties diverge is in their analysis of the two remaining requirements, namely (i) that petitioner's conviction involved an error of the most fundamental character and (ii) that it is probable that a different result would have occurred if not for the error. Petitioner's arguments in this regard rest entirely on *Padilla*, where the Supreme Court held definitively that "counsel must inform her client whether his plea carries a risk of deportation." *Padilla*, 130 S.Ct. at 1486. The government, for its part, contends, first, that *Padilla* does not apply retroactively to the instant collateral attack, and second, that even if it did, petitioner's claim would nonetheless fail on the merits. Both arguments are separately addressed.

### III.

■ The principles governing the retroactive application of new rules on collateral review are well established by *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) and its progeny. Thus, *Teague* requires courts to survey the legal landscape as it existed at the time petitioner's conviction became final to determine whether a particular rule later announced by the Supreme Court is an old or a new rule. *Beard v. Banks*, 542 U.S. 406, 410, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004) (citing *Graham v. Collins*, 506 U.S. 461,

468, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993)). In this regard, "an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review." *Whorton v. Bockting*, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007) (citation omitted). A new rule may, however, be applied retroactively to cases on collateral review if the rule falls within one of two exceptions, namely (i) a substantive rule of criminal law, or (ii) a "watershed rul[e] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Beard*, 542 U.S. at 410, 124 S.Ct. 2504 (internal quotation marks and citations omitted).

■ For purposes of the *Teague* analysis, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301, 109 S.Ct. 1060 (citation omitted). Put differently, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* In this regard, the Fourth Circuit has recognized that "a rule sought by a habeas petitioner is new, and thus consideration of the underlying claim barred, unless reasonable jurists considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor." *O'Dell v. Netherland*, 95 F.3d 1214, 1221 (4th Cir.1996), *aff'd* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) (internal quotation marks and citations omitted).

Neither the Fourth Circuit nor any other circuit has yet decided whether the rule announced in *Padilla* constitutes a "new" rule for purposes of *Teague* retroactivity. The Fourth Circuit has nonetheless noted in dicta in an unpublished decision that "nothing in the *Padilla* decision indicates

that it is retroactively applicable to cases on collateral review." *United States v. Hernandez–Monreal,* 404 Fed.Appx. 714, 715, n. * (4th Cir.2010) (citation omitted). The federal district courts that have thus far confronted the issue have taken differing views. Specifically, some district courts, including one in this district, have held that the rule announced in *Padilla* is new and not within one of the two narrow *Teague* exceptions necessary to warrant retroactive application to cases on collateral review.[3] Other courts have reached the opposite result, concluding that *Padilla* simply applied a new set of facts to the well-settled *Strickland* ineffective assistance of counsel standard and is thus retroactive to cases on collateral review.[4] Still other courts have avoided the issue altogether by assuming without deciding the retroactivity issue and instead proceeding directly to the *Strickland* analysis.[5]

■ Here, a careful review of the existing precedent, combined with a survey of the legal landscape at the time petitioner's conviction became final, points persuasively to the conclusion that the rule announced in *Padilla* constitutes a new rule for purposes of *Teague* retroactivity. To be sure, it is clear that the result in *Padilla* "was not dictated by precedent existing at the time [petitioner's] conviction became final." *Teague,* 489 U.S. at 301, 109 S.Ct. 1060. To the contrary, as Justice Alito

noted in his concurring opinion, in which the Chief Justice joined, *Padilla* effectively overruled "the longstanding and unanimous position of the federal courts ... that reasonable defense counsel generally need only advise a client about the *direct* consequences of a criminal conviction." *Padilla,* 130 S.Ct. at 1487 (emphasis in original) (citations omitted). Indeed, the fact that *Padilla* was a split decision is itself evidence that "reasonable jurists" could differ as to whether they "would have felt compelled by existing precedent to rule in [petitioner's] favor" at the time her conviction became final. *O'Dell,* 95 F.3d at 1221.

■ It is equally clear that the new rule announced in *Padilla* does not fall within one of the two narrow *Teague* exceptions necessary to warrant retroactive application. First, the rule is not a substantive rule of criminal law, as it does not "alter[ ] the range of conduct or the class of persons that the law punishes." *Schriro v. Summerlin,* 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (citations omitted). Nor does *Padilla* constitute a "watershed rul[e] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Beard,* 542 U.S. at 410, 124 S.Ct. 2504 (internal quotation marks and citations omitted). In this regard, the Supreme Court has "repeatedly emphasized the limited scope of the second *Teague* exception,

---

3. *See, e.g., Doan v. United States,* 760 F.Supp.2d 602, No. 1:06cr463, et al., 2011 WL 116811 (E.D.Va. Jan.4, 2011) (Cacheris, J.); *United States v. Perez,* No. 8:02CR296, 2010 WL 4643033 (D.Neb. Nov. 9, 2010); *United States v. Gilbert,* No. 2:03–cr–00349–WJM–1, 2010 WL 4134286 (D.N.J. Oct. 19, 2010).

4. *See, e.g., Marroquin v. United States,* Civil Action No. M–10–156, 2011 WL 488985 (S.D.Tex. Feb. 4, 2011); *Luna v. United States,* No. 10CV1659 JLS (POR), 2010 WL 4868062

(S.D.Cal. Nov. 23, 2010); *United States v. Shafeek,* Criminal Case No. 05–81129/Civil Case No. 10–12670, 2010 WL 3789747 (E.D.Mich. Sept. 22, 2010); *United States v. Chaidez,* 730 F.Supp.2d 896 (N.D.Ill.2010).

5. *See, e.g., United States v. Obonaga,* No. 10–CV–2951 (JS), 2010 WL 2710413 (E.D.N.Y. June 30, 2010); *Toribio–Ascencio v. United States,* Nos. 7:05–CR–00097–FL, 7:08–CV–211–FL, 2010 WL 4484447 (E.D.N.C. Oct. 25, 2010).

explaining that it is clearly meant to apply only to a small core of rules requiring observance of those procedures that ... are implicit in the concept of ordered liberty." *Id.* at 417, 124 S.Ct. 2504 (internal quotation marks and citation omitted). Indeed, it is "unlikely that many such components of basic due process have yet to emerge," and the Supreme Court has "yet to find a new rule that falls under the second *Teague* exception." *Id.*[6]

In sum, then, because the rule announced in *Padilla* constitutes a new rule that does not fit within one of the two narrowly-defined *Teague* exceptions, *Padilla* is not retroactive to cases on collateral review such as the one presented here. Petitioner's motion for a writ of error *coram nobis* is thus appropriately denied on this ground alone.

### IV.

Even assuming, *arguendo*, that the rule announced in *Padilla* were to apply retroactively to petitioner's case, it is clear from a review of this record that her claim would nonetheless fail on the merits. It is well-established that a two-prong analysis applies to claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 688–89, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Specifically, to prevail on such a claim, a petitioner must show, first, that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. Judicial review of counsel's performance in this context is "highly deferential." *Id.* at 689, 104 S.Ct. 2052. Indeed, to establish that counsel's performance was objectively unreasonable, a petitioner must overcome the strong presumption that counsel rendered "adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Id.* at 690, 104 S.Ct. 2052.

If a petitioner demonstrates that counsel's performance was objectively unreasonable, *Strickland* next requires the petitioner to establish that "the deficient performance prejudiced the defense." *Id.* at 688, 104 S.Ct. 2052. Specifically, in step two of the *Strickland* analysis, a petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A proper prejudice analysis also requires consideration of whether "the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Thus, counsel may be deemed constitutionally ineffective only if his or her "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052.

■ Here, the record is in dispute with respect to whether petitioner is able to

---

**6.** In providing guidance to lower courts as to what might constitute a watershed procedural rule falling within the second *Teague* exception, the Supreme Court has referred only to the rule of *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), which held that state courts must provide counsel for indigent criminal defendants. Indeed, the *Gideon* decision "alter[ed] our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Beard*, 542 U.S. at 418, 124 S.Ct. 2504 (internal quotation marks and citation omitted). The new procedural rule announced in *Padilla*, in contrast, "has none of the primacy and centrality of the rule adopted in *Gideon*." *Id.* at 420, 124 S.Ct. 2504 (recognizing that the rule announced in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) that the "Eighth Amendment prohibits any barrier to the sentencer's consideration of mitigating evidence" was not a watershed procedural rule falling within the second *Teague* exception).

meet the performance prong of the *Strickland* analysis, namely whether court-appointed counsel properly advised petitioner about the possible immigration-related consequences of her guilty plea.[7] It is nonetheless unnecessary to resolve this dispute because regardless of whether counsel advised petitioner regarding the risk of deportation in this case, petitioner's ineffective assistance of counsel claim flatly fails on the prejudice prong of the *Strickland* analysis. To be sure, petitioner was explicitly advised in the course of the Rule 11 colloquy that her guilty plea would render her subject to deportation and petitioner acknowledged, under oath, that she understood this possible consequence. *See supra*, p. 794. Simply put, petitioner's sworn acknowledgement in this regard is, by itself, dispositive of the prejudice analysis.[8]

In an unsuccessful attempt to avoid this result, petitioner argues that it was not constitutionally adequate that she be advised of the risk of deportation in the course of the Rule 11 plea colloquy, but instead that her counsel was required to advise her of this risk prior to the plea hearing. Not surprisingly, petitioner does not identify any precedent to support this argument and indeed, the existing authority shows otherwise. *See Brown v. United States*, No. 10 Civ.2012(BMC), 2010 WL 5313546 (E.D.N.Y. Dec. 17, 2010) (stating that "[a]s courts applying *Padilla* have recognized, when a defendant learned of the deportation consequences of his plea from a source other than his attorney, he is unable to satisfy *Strickland*'s second prong because he has not suffered prejudice"). Nor is there any reason in principle or policy that countenances petitioner's argument in this regard, as the record reflects that she was adequately advised from the Bench of the possible immigration consequences of a guilty plea in this case.[9]

---

7. Petitioner, for her part, states in a sworn affidavit that counsel "did not tell me that I could or would be deported if I pled guilty." Pet. Aff. ¶ 10. Petitioner further states that she "do[es] not recall [counsel] giving me any advice whether pleading guilty could or would affect my immigration status ... [and counsel] did not tell me anything about deportation." *Id.* The government, in turn, has submitted a declaration from petitioner's counsel providing, *inter alia*, that "I very likely advised Ms. Mendoza that pleading guilty to a violation of § 1028 could result in her deportation, and I am sure that I advised her to seek the expert legal advice of an immigration attorney." Counsel's Decl. at ¶ 6.

8. *See, e.g., Blackledge v. Allison*, 431 U.S. 63, 73–74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (providing that declarations made "in open court carry a strong presumption of verity" and that "the representations of the defendant ... [at a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings"); *Beck v. Angelone*, 261 F.3d 377, 396 (4th Cir.2001) (holding that absent clear and convincing evidence to the contrary, a defendant is bound by his representations made during a plea colloquy) (citations omitted).

9. *See, e.g., Hernandez–Monreal*, 404 Fed.Appx. at 714–15 (finding trial court's failure to consider a petition for a writ of error *coram nobis* harmless where petitioner, during a Rule 11 plea hearing, affirmatively acknowledged his understanding that his plea could render him subject to deportation); *Gonzalez v. United States*, 10 Civ. 5463(AKH), 2010 WL 3465603, at *1 (S.D.N.Y. Sept. 3, 2010) (concluding that any failure on the part of counsel to advise petitioner that he could be deported as a result of pleading guilty was not prejudicial because the court advised petitioner of this risk prior to acceptance of his plea); *United States v. Cruz–Veloz*, Crim. No. 07–1023, 2010 WL 2925048, at *3 (D.N.J. July 20, 2010) (concluding that "[p]etitioner was not prejudiced by counsel's alleged failure to inform him of the deportation consequences of his plea because the court informed him of the consequences" in the course of the plea hearing).

In addition, the lack of *Strickland* prejudice finds further support in the overwhelming evidence of petitioner's guilt in this case, including petitioner's own sworn confession, extensive documentary evidence, and the testimony of multiple cooperating witnesses. Indeed, the existence of such overwhelming evidence forecloses any reasonable probability that petitioner would have proceeded to trial rather than accept the government's plea offer. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 (requiring petitioner to establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). This is particularly true given the substantial benefits petitioner received at sentencing by pleading guilty in this instance and the corresponding risks she faced had she been convicted of a more serious offense at trial.[10]

Thus, even assuming *Padilla* applied retroactively to the instant collateral attack, petitioner's claim nonetheless fails to meet the well-settled *Strickland* ineffective assistance of counsel standard. Because of this, petitioner is unable to establish that her conviction involved an error of the most "fundamental character" so as to warrant the extraordinary remedy of *coram nobis* relief. *Morgan,* 346 U.S. at

512, 74 S.Ct. 247. Her motion must therefore be denied.

An appropriate order will issue.

---

**10.** In addition to receiving a two-level reduction to her offense level for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, petitioner also received the benefit of a U.S.S.G. § 5K1.1 downward departure motion in this case. These plea-related benefits ultimately resulted in her placement at an offense level of 5 and a guidelines range of imprisonment of zero to six months. Yet, assuming petitioner had been indicted, proceeded to trial, and then been convicted on the instant charge, she would have been assigned an offense level of 12 under the guidelines—which were then mandatory—and a guidelines range of imprisonment of 10 to 16 months. Moreover, the government contends that had petitioner proceeded to trial, it likely

would have sought an indictment against her that included a more serious charge of conspiracy to encourage aliens to reside in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and (B)(i). And, a jury conviction on such a conspiracy offense would not only have resulted in significantly higher guidelines calculations, it would also have had more serious immigration consequences, as it would have (i) constituted an aggravated felony under 8 U.S.C. § 1101(a)(43)(N), (ii) rendered petitioner presumptively deportable under 8 U.S.C. § 1228(b)(5)(c), and (iii) served as a permanent bar to reentry under 8 U.S.C. § 1182(a)(9)(A)(ii).