**UNITED STATES of America**

**v.**

**Ferrone CLAIBORNE and Terrence Richardson**

**No. CRIM. 3:00CR383.**

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 10, 2005.

---

David Novak, Esquire, Assistant United States Attorney, United States Attorney's Office, Richmond, VA, for Government.

Robert B. Rigney, Esquire, Protogyrou & Rigney, P.L.C., Norfolk, VA, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

Ferrone Claiborne and Terrence Richardson were convicted of conspiracy to distribute crack cocaine and sentenced to life in prison. Richardson and Claiborne (collectively "the Defendants") have filed motions under 28 U.S.C. § 2255 challenging their convictions and sentences. The United States has responded.

### SUMMARY OF THE RECORD

Beginning in 1991, Claiborne and Richardson sold cocaine base for the "Dogwood crew" on Dogwood Street in Waverly, Virginia. A few years later, Claiborne and

Richardson began selling cocaine base at the nearby Waverly Village Apartments ("the Village"). On the morning of April 25, 1998, Claiborne and Richardson killed Officer Allen Gibson when he interrupted a drug deal in the woods behind the Village.

Shawn Wooden testified that, on the morning of April 25, 1998, after Claiborne and Richardson obtained a quantity of cocaine base at the Village, the three men walked into some nearby woods. At the time, Richardson was wearing a white T-shirt stamped with the symbol of a marijuana leaf. Wooden began to "test" the crack by smoking it when Officer Gibson appeared out of the woods, yelled "halt," and grabbed Richardson by his shoulder. According to Wooden, Claiborne responded by grabbing Officer Gibson from behind and Officer Gibson reached for his gun. Wooden saw Richardson grab the gun, heard the discharge, and saw Officer Gibson fall to the ground while Richardson remained standing with the gun in his hand. Richardson fled and Wooden ran back to his trailer. Wooden testified that, when Richardson arrived later at the trailer, he was no longer wearing the T-shirt with the marijuana leaf symbol.

Wooden's account was confirmed by the testimony of Evette Newby, a resident of the Village apartments. Newby testified that she was well-acquainted with Richardson and Claiborne, having frequently purchased crack from them. On the morning of April 25, 1998, Newby observed Richardson, Claiborne and another black male near the woods behind her apartment. Richardson, Claiborne, and the third male went into the woods. A short time later, Newby saw Officer Gibson pull into the parking lot at the Village, park his police car, and follow the three men into the woods. Newby saw Officer Gibson talking, and then struggling, with Richardson and

Claiborne. Newby heard a shot and then saw Richardson and the unknown third black male flee in different directions. Richardson had a black object in his hand and was wearing dark jeans and a dark shirt over a white T-shit with a marijuana leaf symbol on it. Newby told her neighbor to call the police.

Other members of the Waverly Police Department soon arrived at the scene, found Officer Gibson lying in the woods, and discovered his weapon approximately ten feet away from where Officer Gibson lay dying. Although Officer Gibson was losing consciousness, he related that he had followed two males into the woods because he thought they were dealing narcotics. His description of the two men generally, but not exactly, matched that of Richardson and Claiborne. Officer Gibson also stated that he had struggled with the men; that they had taken his firearm; that he tried to point the weapon away from himself; but that "[t]hey shot me with my own ... gun." Officer Gibson died later that day.

The day after the shooting, Richardson was arrested and a T-shirt with a marijuana leaf symbol was seized from Richardson's father's home. The T-shirt was ripped on the shoulder where, according to Wooden, Officer Gibson had grabbed Richardson. Two days later, Claiborne was arrested. Both men claimed to have been elsewhere at the time of the shooting. In December 1999, however, Richardson entered a plea of guilty in state court to the involuntary manslaughter of Gibson, and Claiborne entered a plea of guilty to being an accessory after the fact.[1]

The United States also offered forensic evidence which supported its theory that the fatal shot was the product of premedi-

---

1. Other witnesses also testified that they had heard Claiborne and Richardson confess to their involvement in the shooting of Officer Gibson.

tation. For instance, a firearms examiner determined that the trigger pull on Officer Gibson's firearm was 7.5 pounds and that the weapon had three safety features to prevent an unintended firing. The examiner also determined that the fatal shot was fired six to twelve inches from Officer Gibson's body, with twelve inches being the more likely distance. The evidence also reflected that Officer Gibson was wearing a bullet proof vest at the time of the shooting. It would have been apparent to Claiborne and Richardson as they struggled with Gibson that he was wearing such a vest. The fatal shot was directed to an area of Officer Gibson's body that was not protected by the vest.

Claiborne and Richardson were convicted of conspiring to distribute 50 grams or more of cocaine base, *see* 21 U.S.C. § 846, but the jury acquitted them of killing a law enforcement agent during narcotics trafficking, *see* 21 U.S.C. § 848(e)(1)(B), and using a firearm to commit murder during a narcotics trafficking offense, *see* 18 U.S.C. § 924(j). However, at sentencing, the Court applied a cross-reference to the first degree murder guideline based on its factual finding, by clear and convincing evidence, that the Defendants had "killed [Officer Gibson] under circumstances that would constitute murder under 18 U.S.C. § 1111." United States Sentencing Guidelines Manual § 2D1.1(d)(1) (2001). Application of the cross-reference yielded a base offense level of 43 for each Defendant. The Court determined that the Guidelines directed the imposition of life sentences.

Claiborne and Richardson then moved for a downward departure on the grounds that they had been prosecuted in state court for Gibson's murder, they had been acquitted of the federal murder charge, and they were now faced with presumptive life sentences based on the cross-reference. The Court denied the motion.

Richardson and Claiborne unsuccessfully appealed their convictions and sentences to the United States Court of Appeals for the Fourth Circuit. *United States v. Richardson,* 51 Fed.Appx. 90 (4th Cir. Oct.29, 2002). On March 3, 2003, the Supreme Court of the United States denied the petition for a writ of certiorari filed by Richardson and Claiborne.

Shortly before March 3, 2004, Richardson and Claiborne each filed a motion for relief under 28 U.S.C. § 2255. In his original motion, Claiborne, by counsel, asserted that he was entitled to relief on the following grounds:

Claim 1 Claiborne received ineffective assistance of counsel during the sentencing proceeding when counsel failed to present exculpatory DNA evidence.

Claim 2 Claiborne was denied effective assistance of counsel when appellate counsel failed to raise:

A) A claim that sentencing counsel was deficient for failing to present purported exculpatory DNA evidence at sentencing.

B) An argument challenging the contradictory and false testimony of Wooden and Newby used to support the sentencing enhancement pursuant to U.S.S.G. § 2D1.1(d)(1).

On September 30, 2004, Claiborne amended his motion to include the following claim:

Claim 3 Claiborne's rights under the Fifth and Sixth Amendment were violated when he was sentenced based on facts that had not been proven beyond a reasonable doubt to the jury.

Richardson contends that he is entitled to relief on the following grounds:

Claim 1 Richardson was denied effective assistance of counsel when coun-

sel conceded during closing arguments that Richardson sold drugs.

Claim 2   Richardson was denied the effective assistance of counsel because counsel failed to pursue the Fifth and Sixth Amendment challenges set forth in Claim 3.

Claim 3   Because the jury acquitted Richardson of the murder of Gibson, Richardson's rights under the Fifth and Sixth Amendment were violated when the Court subsequently found Richardson had committed the murder and sentenced him to life in prison.

As to each petition, the United States responds that the first and second claims lack merit and that the third claims are barred by the new rule doctrine.

## II.   INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on an ineffective assistance of counsel claim, a defendant must show, with specificity, how counsel's representation was deficient and then must establish that the deficient performance prejudiced the defense. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The deficient performance facet of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 688, 104 S.Ct. 2052. To satisfy this facet of *Strickland,* each defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. 2052. The standard for deficient performance is "not merely below average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." *Griffin v. Warden, Maryland Correctional Adjustment Center,* 970 F.2d 1355, 1357 (4th Cir.1992). Finally, and if a trial strategy is shown by the evidence, the

defendant must overcome the "strong presumption ... that, under the circumstances, the challenged action, 'might be considered sound trial strategy'". *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

The prejudice facet of the *Strickland* test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052. In this regard, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

### A.   Purported Ineffective Assistance of Trial Counsel

#### 1.   Richardson's Claim 1

Richardson contends that he was denied effective assistance of counsel because twice during closing argument counsel conceded to the jury that Richardson sold drugs. First, Richardson asserts that counsel admitted to the jury that Richardson was a drug dealer in the following passage that was part of the argument attempting to discredit a government witness, Keith Jackson:

By the time the federal investigation starts, [Richardson and Claiborne] are the ones the law enforcement still think did this. Well, what's the first thing Mr. Novak says to him when they clear the door and start to warm up the seat?

If you testify truthfully, we won't prosecute you for any of your drug trafficking crimes ever, ever. You're off the hook as far as we're concerned. Now, tell us about Mr. Richardson and Mr. Claiborne. *They were dealing drugs down there, weren't they? Okay.*

Now, how smart do you have to be to figure what the right answer to that question is?

June 11, 2001 Tr. at 75.

This charge of ineffective assistance of counsel fails for the simple reason that, in making this argument, counsel did not concede Richardson's guilt. Rather, counsel merely attempted to show the jury how the police got the witness to testify that the defendants were drug dealers. Clearly, the witness did testify to that effect. This effort to discredit him was neither a concession of guilt nor ineffective representation.

█ Second, Richardson asserts that counsel conceded guilt in an argument made to undercut the testimony of special agent Robert. *See* June 6, 2001 Tr. at 16–18. On this score, it is correct that counsel acknowledged that Richardson had stated to Robert that: "I may have sold some drugs back in the day." June 11, 2001 Tr. at 97–98. However, counsel went on to explain that the admission was not pertinent to the charge that Richardson had conspired to distribute crack, because it was likely that Richardson was referring to prior dealings in marijuana. *Id.* at 98. Counsel then rhetorically asked: "What drugs did he say that he was selling? He said drugs, just drugs. Now is marijuana a drug? It certainly is." *Id.* That was not a concession of guilt of the charge for which Richardson was on trial. Instead, it was an explanation that the statement which Richardson had made was not directed to the drug charge for which he was on trial.

Neither statement constituted ineffective representation of counsel. Therefore, Richardson's Claim 1 will be dismissed.

**2. Claiborne's Claim 1**

█ In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel, performance was deficient if the claim is readily dismissed for a lack of prejudice. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. In Claim 1, Claiborne faults trial counsel for not reminding the Court during the sentencing proceeding that, despite extensive testing of Gibson's and Claiborne's clothing, no DNA evidence had been recovered that linked Claiborne to the murder. However, that point had been made during the trial and the Court was well aware of it. Claiborne's sentence would not have been different had counsel pursued the issue at sentencing. Thus, Claiborne has failed to demonstrate prejudice. Accordingly, Claiborne's Claim 1 will be dismissed.

**B. Purported Ineffective Assistance of Appellate Counsel**

**1. Claiborne's Claims 2(a) and 2(b)**

Claiborne contends that appellate counsel was deficient for failing to raise a claim that trial counsel was deficient for not arguing at sentencing that there was a lack of DNA evidence linking Claiborne to the murder of Officer Gibson, (Claim 2(a)). Additionally, Claiborne faults appellate counsel for failing to argue that the testimony of Wooden and Newby, the prosecution's two eyewitnesses to the murder, was so contradictory and incredible that it could not be used to support the sentencing enhancement pursuant to U.S.S.G. § 2D1.1(d)(1) (Claim 2(b)). For the reasons discussed previously in conjunction with Claim 1, the Court concludes that Claiborne was not prejudiced by counsel's failure to pursue Claim 2(a) on appeal. Nor has Claiborne demonstrated a reasonable probability of a different result had appellate counsel devoted argument to the credibility of Wooden and Newby. Accordingly, Claiborne's Claim 2(a) and Claim 2(b) will be dismissed.

### 2. Richardson's Claim 2

■ Richardson contends that appellate counsel was deficient for failing to pursue a claim that Richardson's rights under the Fifth and Sixth Amendments were violated when the Court sentenced him based on factors that the jury had expressly declined to find had been proven beyond a reasonable doubt. As explained below, that a claim would have merit under the rules announced in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and *United States v. Booker*, — U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). However, at the time of the trial and the appeal in this case, the claim lacked merit under the established precedent in the Fourth Circuit. *See United States v. Sanders*, 247 F.3d 139, 150 (4th Cir.2001); *United States v. Kinter*, 235 F.3d 192, 199–200 (4th Cir.2000)(rejecting the argument that a defendant is entitled to have a jury decide any fact that could be used to enhance his sentence under the Sentencing Guidelines). Under the deficient performance facet of *Strickland*, "every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689, 104 S.Ct. 2052. Thus, Claiborne cannot demonstrate that counsel was deficient because counsel followed the controlling circuit law at that time and failed to anticipate the rule announced in *Booker*. *United States v. McNamara*, 74 F.3d 514, 516–17 (4th Cir. 1996) (citing *Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir.1995)). Accordingly, Richardson's Claim 2 will be dismissed.

### III. CLAIM 3: RICHARDSON AND CLAIBORNE'S DEMAND FOR RELIEF UNDER *BLAKELY* AND *BOOKER*

In their third claim, the Defendants contend that their rights under the Fifth and Sixth Amendment were violated when, notwithstanding that the jury acquitted them of the murder of Gibson, at sentencing the Court nevertheless found, by clear and convincing evidence, that they had murdered Gibson and sentenced them to life in prison based upon that fact. .Evaluation of the Defendants' third claim for relief requires a brief review of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and its progeny.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. In June 2004, the Court revisited that rule in the context of a state sentencing guideline scheme, clarifying that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 2537, 159 L.Ed.2d 403 (2004) (citations omitted)(emphasis in original). Applying the principle set forth in *Apprendi* to this definition of "statutory maximum," the Court held that Blakely's sentence— which was enhanced under the state guidelines based on the sentencing court's additional finding by a preponderance of the evidence that Blakely committed his kidnaping offense with deliberate cruelty— violated the Sixth Amendment. *Id.* at 2537–38. In *United States v. Booker*, — U.S. ——, ——, 125 S.Ct. 738, 749, 160 L.Ed.2d 621 (2005), the Supreme Court recently found "no distinction of constitu-

tional significance between the Federal Sentencing Guidelines and the Washington procedures at issue" in *Blakely*. Extending its holding in *Blakely* to the Federal Sentencing Guidelines, the Court explicitly reaffirmed that, as first pronounced in *Apprendi*, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756. Thus, the Court held that the mandatory nature of the Federal Sentencing Guidelines rendered them incompatible with the Sixth Amendment's guarantee of the right to a jury trial and excised those portions of the Guidelines that made them mandatory. *Id.* at 759–64.

## A. The New Rule Doctrine

The United States responds that the Defendants' claims of relief based on *Blakely* and *Booker* are barred by the new rule doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The doctrine provides that new rules of constitutional criminal procedure generally are not applied retroactively on collateral review. *Id.* at 312–14, 109 S.Ct. 1060 This principle protects the societal interest in the finality of convictions. *Id.* at 310, 109 S.Ct. 1060. " 'No one, not criminal defendants, not the judicial system, not society as a whole is benefitted by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation.' " *Id.* at 309, 109 S.Ct. 1060 (quoting *Mackey v. United States*, 401 U.S. 667, 691, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)).

## B. Application Of The New Rule Doctrine

█ The Supreme Court has prescribed a three-step process for determining whether a constitutional rule of criminal procedure applies to a case on collateral review. *Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004).

First, the court must determine when the defendant's conviction became final. Second, it must ascertain the legal landscape as it then existed, and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule. That is, the court must decide whether the rule is actually new. Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity. *Id.*

### 1. The Defendants' Convictions Became Final On March 3, 2003

In this case, the first step does not require extended analysis. The Defendants' convictions became final on March 3, 2003, when the Supreme Court denied their petitions for a writ of certiorari. *See Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994).

### 2. *Blakely* and *Booker* Announced A New Rule

█ The next step in the analysis requires a determination of whether *Blakely* and *Booker* announced a new rule in relation to the precedent existing as of March 3, 2003. In *Teague*, the Supreme Court explained that "a case announces a new rule when it breaks new ground or imposes a heretofore new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time petitioner's conviction became final." 489 U.S. at 301, 109

S.Ct. 1060 (emphasis in original). Thus, it is necessary to ascertain whether the requirement that a jury find beyond a reasonable doubt all facts necessary to the imposition of a defendant's sentence under a mandatory determinate guideline sentencing scheme was dictated by the precedent that existed on March 3, 2003.

### a. The Relevant Legal Landscape

The Fifth and Sixth Amendment principles that animate *Blakely* and *Booker* appeared on the horizon in 1999 in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). Before *Jones,* it was established that, under the Fifth and Sixth Amendments, a determination that a fact is an element of the offense, rather than a mere sentencing consideration, required that the fact be alleged in the indictment, submitted to the jury, and proven beyond a reasonable doubt. *United States v. Gaudin,* 515 U.S. 506, 509–10, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995); *Buckley v. Butler,* 825 F.2d 895, 903 (5th Cir.1987). Before 1999, the Supreme Court recognized that there were "certain limited circumstances" wherein the Constitution required that a fact be proven beyond a reasonable doubt even though the legislature had chosen not to characterize that fact as an element of the offense. *McMillan v. Pennsylvania,* 477 U.S. 79, 86, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).[2] Nevertheless, the Court stressed that, in distinguishing between elements of the offense and mere sentencing factors, the "legislature's definition of what facts are elements of the offense is usually dispositive." *Id.* at 85, 106 S.Ct. 2411 (citing *Patterson v. New York,* 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)); *see Almendarez–Torres v. United States,* 523 U.S. 224, 228, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).

Furthermore, the Court concluded that generally the requirements of due process are satisfied if a sentencing factor is proven by a preponderance of the evidence. *Id.* at 91–92, 106 S.Ct. 2411 (upholding use of preponderance of the evidence standard so long as the sentencing enhancement was not "a tail which wags the dog of the substantive offense"). In light of that conclusion, in ruling on a double jeopardy challenge, the Court held that, "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as the conduct has been proved by a preponderance of the evidence." *United States v. Watts,* 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997).

In 1999, in *Jones v. United States,* 526 U.S. 227, 230, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), the Court addressed the federal carjacking statute, which provided three different maximum sentences depending on the extent of harm to the victim: 15 years in jail if there was no serious injury to a victim, 25 years if there was "serious bodily injury," and life in prison if death resulted. 18 U.S.C. § 2119 (1988 ed., Supp. V). The Court noted that the statute has "a look to it suggesting [that the provisions relating to the extent of harm to the victim] are only sentencing provisions." *Jones,* 526 U.S. at 232, 119 S.Ct. 1215. Nevertheless, the Court concluded that treating the provision as a mere sentencing factor would raise serious Sixth Amendment concerns. *Id.* at 244, 119 S.Ct. 1215. Therefore, the Court interpreted the statute as treating the harm to the victim as an element of the offense. *Id.* at 252, 119 S.Ct. 1215.

---

2. In *McMillan,* the Court concluded that a Pennsylvania statute, which required the judge to impose a minimum sentence if he found certain facts by a preponderance of the evidence, did not violate the Constitution.

Thereafter, in *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Court held that: "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Court concluded that, it was irrelevant that New Jersey had labeled the ascertainment of motivational bias as a "sentence enhancement," rather than a separate criminal act, and therefore, for constitutional purposes, *id.* at 478, 120 S.Ct. 2348, adhered to the view that the statutory maximum for a particular crime was located in the substantive criminal statute, rather than in sentencing guidelines. On that point, the Court observed:

> The principal dissent ... treats us to a lengthy disquisition on the benefits of determinate sentencing schemes, and the effect of today's decision on the federal Sentencing Guidelines. The Guidelines are, of course, not before the Court. We therefore express no view on the subject beyond what this Court has already held. *See, e.g., Edwards v. United States,* 523 U.S. 511, 515, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998) (opinion of Breyer, J., for a unanimous court) (noting that "[o]f course, petitioners' statutory and constitutional claims would make a difference if it were possible to argue, say, that the sentences imposed exceeded the maximum that the statutes permit for a cocaine-only conspiracy. That is because a maximum sentence set by statute trumps a higher sentence set forth in the Guidelines.").

*Id.* at 497 n. 21, 120 S.Ct. 2348 (internal citations omitted).

In 2002, in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Court revisited Arizona's capital sentencing scheme in light of *Apprendi*.[3] Under the Arizona law in question, the maximum punishment was life in prison unless the judge made a finding that an aggravating factor was involved, in which case the death penalty could be applied. *See id.* at 592, 122 S.Ct. 2428. The Court struck down the statute, holding that, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt .... A defendant may not be expose[d] ... to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 602, 122 S.Ct. 2428 (internal citations omitted)(emphasis in original).

That same year, in *Harris v. United States,* 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), the Court revisited the issue of mandatory minimum sentences in the context of 18 U.S.C. § 924(c). The defendant was convicted for possession of a firearm in conjunction with a drug trafficking offense. *Id.* at 551, 122 S.Ct. 2406. The statute provided for a mandatory minimum sentence of five years for simple possession and for a mandatory minimum sentence of seven years if the defendant brandished the weapon. At sentencing, the district court found, by a preponderance of the evidence, that the defendant had brandished the weapon. As a result, the district court sentenced the defendant to seven years on the § 924(c) charge. Because that fact had only increased the defendant's minimum sentence, the Supreme Court rejected the defendant's assertion that *Apprendi* required a jury to find beyond a reasonable doubt that he had brandished weapon. *Id.* at 568, 122 S.Ct. 2406. A plurality of the justices

---

**3.** Previously, in *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the Court had held that Arizona's capital sentencing scheme was constitutional.

adhered to the position that "[w]hether chosen by the judge or the legislature, the facts guiding judicial discretion below the statutory maximum need not be alleged in the indictment, submitted to jury or proved beyond a reasonable doubt." *Id.* The plurality explained that a judge could be required to select any sentence below the statutory maximum,

> based on facts not alleged in the indictment or proved to the jury—even if those facts are specified by the legislature, and even if they persuade the judge to impose a much higher sentence than he or she otherwise would have imposed. That a fact affects a defendant's sentence even dramatically so, does not make it an element.

*Id.* In sum, the plurality emphasized that below the statutory maximum the legislature was free to severely channel the judge's sentencing discretion without running afoul of the Fifth or Sixth Amendments. *Id.* at 566, 122 S.Ct. 2406. That ruling, however, did not foretell the imminent demise of the Federal Sentencing Guidelines.

### b. The Result in *Booker* and *Blakely* was not Dictated by the Existing Precedent

Having surveyed the relevant precedent as it existed on March 3, 2003, it is now necessary to ask whether the rule announced in *Blakely* and *Booker* is a new rule. Since *Teague*, the Court has restated this aspect of the inquiry in different forms:

> In *Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), the Court held that a rule was not considered to be dictated by precedent if it "was susceptible to debate among reasonable minds." And in *Lambrix v. Singletary*, 520 U.S. 518, 527–28, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997), the Court determined whether a rule was dictated by precedent by asking whether

> "the unlawfulness of [petitioner's] conviction was apparent to all reasonable jurists."

*United States v. Martinez*, 139 F.3d 412, 415 (4th Cir.1998). This step of the inquiry serves to protect "reasonable, good-faith interpretations of the existing precedents," even though they are shown to be contrary to rules announced in later decisions. *Butler*, 494 U.S. at 414, 110 S.Ct. 1212.

While *Apprendi* and *Ring* foreshadowed the result ultimately reached in *Blakely* and *Booker*, it cannot be said that the unlawfulness of the Defendants' guideline sentence was apparent before *Blakely*. *See Lambrix*, 520 U.S. at 527–28, 117 S.Ct. 1517. Before *Blakely*, it was understood among the federal courts of appeal that the statutory maximum for a particular offense was found in those portions of the United States Code setting forth the offenses and penalties, not in the sentencing guidelines. Therefore, it was generally agreed, "the current practice of judicial factfinding under the Guidelines is not subject to the *Apprendi* requirements—at least so long as that factfinding does not enhance a defendant's sentence beyond the maximum term specified in the substantive statute." *United States v. Kinter*, 235 F.3d 192, 201 (4th Cir.2000); *see also United States v. Gibson*, 54 Fed.Appx. 401 (4th Cir.2003) (rejecting the assertion that *Ring* and *Apprendi* rendered defendant's sentence under the guidelines unconstitutional).

"*Blakely* changed courts' understanding of *Apprendi*'s statutory maximum ...." *Lloyd v. United States*, 407 F.3d 608, 613 (3d Cir.2005). "[P]ost-*Apprendi* but pre-*Blakely*, a court would not have believed itself compelled to conclude that what became the '*Blakely* rule' was constitutionally required." *Id.; see United States v. Booker*, 375 F.3d 508, 518 (2004) (Easter-

brook, Circuit Judge, dissenting) ("Why did the Justices deploy that phrase ['statutory maximum'] in *Apprendi* and repeat it in *Blakely* (and quite a few other decisions)? Just to get a chuckle at the expense of other judges who took them seriously and thought that 'statutory maximum' might have something to do with statutes? Why write 'statutory maximum' if you mean 'all circumstances that go into ascertaining the proper sentence'?"). The fact that, even in the wake of *Blakely*, the federal judiciary continued to be deeply divided as to whether *Blakely* applied to the Federal Sentencing Guidelines evinces the novelty of the Sixth Amendment principles announced in that case. *Lloyd*, 407 F.3d at 613; *see United States v. Hammoud*, 381 F.3d 316, 348 (4th Cir.2004) (en banc). Indeed, one need look no further than the disagreement between the justices in *Blakely* to find support for the proposition that the rule announced in *Blakely* was subject to debate among reasonable jurists. *See Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 2513 n. 5, 159 L.Ed.2d 494 (2004); *Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (describing a new rule as a result "over which reasonable jurists may disagree").[4] Thus, this Court agrees with "every court of appeals to have considered the issue and concludes that, whether denominated as the '*Blakely* rule' or the '*Booker* rule,' that rule was 'new.' " *Lloyd*, 407 F.3d at 613; *Guzman v. United States*, 404 F.3d 139, 141–44 (2d Cir.2005); *Varela v. United*

*States*, 400 F.3d 864, 866–68 (11th Cir. 2005); *United States v. Price*, 400 F.3d 844, 845 (10th Cir.2005); *Humphress v. United States*, 398 F.3d 855, 860–63 (6th Cir.2005); *McReynolds v. United States*, 397 F.3d 479, 480–81 (7th Cir.2005).

### 3. The New Rule Announced in *Blakely* and *Booker* Does Not Fall Within Either of the Two Exceptions to Nonretroactivity.

■ Because the rule from which the Defendants seek to benefit is a new rule, it may be applied retroactively to a case on collateral review only if it: (1) "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe;" or (2) it constitutes a "watershed rule[ ] of criminal procedure" implicating fundamental fairness and accuracy of the criminal proceeding. *Teague*, 489 U.S. at 311, 109 S.Ct. 1060. The first *Teague* exception is not presented here.

The Supreme Court repeatedly has emphasized the extremely limited scope of the second *Teague* exception. *See Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 2513, 159 L.Ed.2d 494 (2004). The second exception,

> is clearly meant to apply only to a small core of rules requiring observance of those procedures that ... are implicit in the concept of ordered liberty. And, because any qualifying rule would be so central to an accurate determination of innocence or guilt [that it is] unlikely that many such components of basic due

---

**4.** There is language within *Blakely* wherein the Court professes merely to "apply the rule we expressed in *Apprendi*." *Blakely*, 124 S.Ct. at 2536. The Court, however, has cautioned against assigning significant weight to such comments in conducting the new rule analysis. *Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990) (stating: "the fact that a court says that its

decision ... is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*. Courts frequently view their decisions as being 'controlled' or 'governed' by prior opinions even when aware of reasonable contrary conclusions reached by other courts.").

process have yet to emerge, it should come as no surprise that we have yet to find a new rule that falls under the second *Teague* exception.

*Id.* at 2513–14 (internal citations and quotations omitted).

■ Relying on the Supreme Court's decision in *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), every circuit court that has addressed the issue has concluded that neither of the above exceptions to nonretroactivity is applicable to the rule announced in *Blakely* and *Booker. Lloyd v. United States,* 407 F.3d 608, 614–16 (3d Cir.2005); *Guzman v. United States,* 404 F.3d 139, 141–44 (2d Cir.2005); *Varela v. United States,* 400 F.3d 864, 866–68 (11th Cir. 2005); *United States v. Price,* 400 F.3d 844, 845 (10th Cir.2005); *Humphress v. United States,* 398 F.3d 855, 860–63 (6th Cir.2005); *McReynolds v. United States,* 397 F.3d 479, 480–81 (7th Cir.2005).

In *Summerlin,* the Supreme Court concluded that the extension of the principle of *Apprendi* in *Ring* did not fall within the first exception to nonretroactiviy because the rule does not "alter the range of conduct or the class of persons the law punishes." 124 S.Ct. at 2523. In order to assess whether the rule in *Ring* constituted a watershed rule under the second exception to retroactivity, the Court asked the following question: "does judicial fact-finding so 'seriously diminish[ ]' accuracy that there is an 'impermissibly large risk' of punishing conduct the law does not reach?" *Id.* (quoting *Teague,* 489 U.S. at 312–13, 109 S.Ct. 1060). The Court concluded that the evidence was simply too equivocal to answer the question in the affirmative and therefore concluded that the rule did not fall into *Teague*'s second exception. *Id.* at 2526.

*Summerlin* disposes of the argument that altering the identity of the decision-maker from the judge to the jury qualifies as a watershed rule. Of course, *Summerlin* did not address the aspect of *Apprendi* which provides that facts necessary to increase a maximum statutory sentence be found beyond a reasonable doubt rather than by a preponderance of the evidence. *Id.* at 2522 n. 1. The Fourth Circuit previously has concluded, however, that the quantum of proof aspect of *Apprendi* is not of such a magnitude that it qualifies as a watershed rule. *United States v. Sanders,* 247 F.3d 139, 148–50 (4th Cir.2001). The court explained that, while the rights to counsel, to trial by jury, and to be proven guilty beyond a reasonable doubt are fundamental, "these watershed principles in turn spawn numerous questions which are closer to the constitutional margins. These subsidiary questions may qualify as arguable applications of a bedrock principle, but they are not core guarantees themselves." *Id.* at 151. The court noted that, unlike the right to counsel established in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the paradigmatic example of a watershed rule, defendants impacted by an *Apprendi* violation cannot claim that their convictions are tainted. *Id.* at 148–51. Rather, at most, if a defendant properly preserved the issue, a defendant might be entitled to an adjustment of his sentence. The conclusion that the extension of *Apprendi* announced in *Booker* is an application of bedrock principle, rather than the announcement of a core guarantee, is reinforced by the facts that ultimately, "*Booker* does not move any decision from judge to jury or change the burden of persuasion." *McReynolds,* 397 F.3d at 481. The practical effect under the remedial portion of *Booker* is that "petitioners' sentences would be determined in the same way if they were sentenced today; the only change would be the degree of flexibility judges would enjoy in applying the guideline system." *Id.* Viewed in perspective of

that precedent, the rule announced in *Booker* does not fall within *Teague*'s second exception to nonretroactivity. Thus, the Defendants' request for relief on their third claim is foreclosed by the new rule doctrine and will be dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants' 28 U.S.C. § 2255 motions are denied and the actions are dismissed.

The Clerk is directed to send a copy of the Memorandum Opinion to Claiborne, Richardson, and counsel of record.

It is so ORDERED.